**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **AARON BALL**<br>**9421 HALE DRIVE**<br>**CLINTON, MARYLAND 20735**<br><br>**Plaintiff**<br><br>**v.**<br><br>**THE GEORGE WASHINGTON UNIVERSITY**<br>**2121 I STREET, NW**<br>**WASHINGTON, DC 20052**<br><br>**SERVE:**<br>**MARY LYNN REED**<br>**REGISTERED AGENT**<br>**2100 PENNSYLVANIA AVENUE, NW**<br>**SUITE 250**<br>**WASHINGTON, DC 20052**<br><br>**Defendant.** | : | **Civil Action Number**<br>____________________ |

=======================================

**COMPLAINT**

Plaintiff, AARON BALL, by and through undersigned counsel, Billy L. Ponds, of The Ponds Law Firm, respectfully submits this Complaint against The George Washington University. In support of his claims, plaintiff Aaron Ball states as follows:

**JURISDICTION AND VENUE**

1. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, *et. seq.*, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("the ADA"), and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367

2. Plaintiff Aaron Ball ("Ball") brings this action to redress the defendants' deprivation of rights secured to him pursuant to the Americans with Disabilities Act of 1990,

42 U.S.C. § 12101 *et seq.* ("the ADA"), and the District of Columbia Human Rights Act, D.C. Code § 2-1401.01 *et se.* ("DCHRA").

3. On December 24, 2015, Ball submitted a Charge of Discrimination, EEOC Case #570-2016-00528, with the U.S. Equal Opportunity Employment Commissions ("EEOC").

4. Ball filed his Complaint with this court within ninety (90) days of receipt of the EEOC Dismissal and Notice of Rights letter dated and issued on February 7, 2017.

5. Venue is proper in this Court as set forth herein.

**PARTIES**

6. Ball is a thirty-nine (39) year-old African-American male who at all relevant times herein was employed as a plumber at the George Washington University ("GWU").

7. GWU is a private university located in the District of Columbia with the authority to sue and be sued, and is an employer within the meaning of the DCHRA and a covered entity within the meaning of the ADA.

**FACTS**

8. On or about December 16, 2008, Ball commenced employment as a plumber at GWU.

9. Ball graduated from ABC Plumbing School in 2011 or 2012.

10. Ball commenced employment as a plumber at GWU during his third year of plumbing school.

11. Ball continued his plumber position at GWU until he was terminated on August 13, 2015.

12. In 1998, Ball was the victim of a shooting.

13. As a result of the aforementioned shooting, the bullet splintered and numerous fragments of the bullet were lodged into Ball's back and shoulder close to his arteries.

14. As a result of the injury from the aforementioned shooting, Ball experienced significant pain in his right shoulder, right ankle, and lower leg, particularly when he performed his plumbing duties.

15. The pain Ball experienced as a result of the injuries he sustained in the shooting affected his ability to perform his duties as a plumber at GWU and caused him to further injure his shoulder.

16. On or about March 5, 2013, Ball applied for leave pursuant to the Family Medical Leave Act ("FMLA") due to the injuries he sustained in the 1998 shooting.

17. Ball's treating physician, Dr. John P. Byrne ("Dr. Byrne)", completed the Certification Form for Employee's Serious Health Condition and GWU approved Ball's FMLA request beginning March 5, 2013, through April 16, 2013.

18. As a result of Ball's tenuous medical condition, he subsequently submitted a short-term disability claim to Unum Benefits Center.

19. Ball was approved for short-term disability from March 5, 2013, until January 22, 2014.

20. Dr. Byrne issued Certificates of Disability to verify Ball's disability and that he was physically unable to work.

21. In December of 2013, Ball returned to work for a brief period of time.

22. On December 17, 2013, Ball's doctor issued a Certificate of Disability which indicated he could not return to work, due to his disability, until February 15, 2014.

23. After the expiration of Ball's short-term disability coverage, he received long-term disability coverage.

24. In January 2014, after Ball had undergone several CT scans, Dr. Byrne determined it was imperative to perform a surgical procedure to remove some of the bullet fragments.

25. The above-noted surgical procedure was intended to alleviate the pain Ball experienced as described herein and to repair a torn rotator cuff.

26. The surgical procedure was originally scheduled for January 22, 2014.

27. As a result of extenuating financial circumstances related to Ball's health insurance coverage, the surgical procedure did not occur on January 22, 2014.

28. On or about April 7, 2014, United Healthcare Services approved the afore-mentioned surgical procedure.

29. On or about April 7, 2014, the afore-mentioned surgical procedure was rescheduled for April 16, 2014.

30. On or about April 7, 2014, Ball's request for FMLA leave was approved from March 18, 2014, until May 18, 2014.

31. On April 16, 2014, Dr. Byrne performed the afore-mentioned surgical procedure to remove the bullet fragments lodged in Ball's back and shoulder and to repair his torn rotator cuff.

32. As a result of Ball's medical condition, the surgical procedure, and his ongoing disability, Dr. Byrne issued a Certificate of Disability stating Ball had been disabled since March 18, 2014, and could not return to work until after his April 16, 2014, surgical procedure.

33. After the surgical procedure was completed, Ball was directed to undergo post-operative physical therapy until June 9, 2015.

34. On or about May 28, 2014, Ball submitted a request to GWU for an accommodation for medical leave until June 20, 2014, under the ADA.

35. GWU approved Ball's aforementioned request for medical leave from June 9, 2014, to June 20, 2014.

36. Dr. Byrne issued subsequent Certificates of Disability which noted the date of Ball's disability and stated he could not work from June 20, 2014, to December 19, 2014.

37. GWU approved Ball's leave under the ADA from June 20, 2014, until July 25, 2014, from July 28, 2014, until August 22, 2014, and from August 25, 2014, until September 26, 2014.

38. On November 4, 2014, Ball was approved for additional ADA leave through November 7, 2014.

39. On December 19, 2014, Dr. Byrne stated that Ball was able to return to work on December 22, 2014, on fully duty with no restrictions.

40. As a result of Ball's medical condition and ongoing disability, Ball only returned to work for approximately thirty (30) days, from December 22, 2014, to the end of January 2015.

41. Dr. Byrne subsequently issued additional Certificates of Disability which precluded Ball from working due to his disability from January 30, 2015, until June 9, 2015.

42. At all times Ball took leave from work as a result of his injury and disability, from March 5, 2013, until June 9, 2015, Ball was always either on FMLA leave or ADA leave.

43. On June 9, 2015, Dr. Byrne stated that Ball was able to return to work on June 23, 2015, on full duty with no restrictions.

44. Based on Dr. Byrne's determination that Ball was able to return to work on June 23, 2015, on full duty with no restrictions, Ball notified Marion Blythe ("Blythe"), the GWU Junior Human Resources Analyst, that on Tuesday, June 23, 2015, he would return to work.

45. When Ball returned to work on June 23, 2015, GWU made no arrangements for him to have the required equipment necessary to fulfill his daily assignments.

46. The log/call system for the Plumbing Division had changed prior to Ball's return to full duty.

47. Specifically, all logs and calls were processed with the department issued iPhone or a cellular phone.

48. Upon returning to work, Ball was not provided with the following equipment issued to all other facility employees: an iPhone or iPod to access or log his plumbing assignments, e-mail access, or a work-issued telephone to communicate with the supervisor and other facility employees.

49. Similarly situated non-disabled plumbers were provided with the aforementioned equipment.

50. Due to the lack of equipment to perform his duties, Ball was required to log his plumbing assignments manually on paper.

51. At the end of the workday, Ball submitted his plumbing assignment log records to Silene de Almeida ("Almeida").

52. Shortly after Ball returned to work, he reported to the Human Resources office to discuss his leave in relation to his ongoing physical therapy.

53. Blythe advised Ball that GWU owed him leave, she would complete the necessary paperwork for processing that leave, and she would contact him later that day to notify him that the paperwork had been completed and processed.

54. Blythe subsequently reported to Harold Speed ("Speed"), the Director of Facilities, to discuss Ball's leave.

55. After Ball had left Blythe's office, he realized he had left some documents on a chair outside of the room in the Support Building and he returned to the Support Building to retrieve his papers.

56. As Ball opened the door to the afore-mentioned office, he overheard Speed tell Laverne Grant ("Grant"), the Division of Operations Event Coordinator, of his efforts to terminate Ball's employment as a GWU plumber.

57. After her meeting with Speed, Blythe contacted Ball to advise him he had no available leave even though the personnel records reflected that GWU owed him at least eighteen (18) days of leave.

58. Blythe further informed Ball he would need to take leave without pay, which GWU considers to be very unprofessional, in order to attend any of his physical therapy appointments.

59. Ball's leave was crucial to adhere to his post-operative therapy as ordered by Dr. Byrne, and it was Ball's desire to use his leave to attend his medical appointments.

60. As a result of the situation described above, Ball was required to forego two days' pay to attend two separate physical therapy appointments.

61. Upon information and belief, GWU, through Blythe, intentionally misrepresented Ball's leave.

62. Upon information and belief, the motivating factor for GWU's intentional misrepresentation was Ball's disability.

63. Ball was not able to further address the leave issue until Thomas Wells ("Wells"), the Plumbing Supervisor, returned from his vacation.

64. When Wells returned from his vacation, Ball met with him and inquired about his leave.

65. During the aforementioned meeting, Wells inquired whether Ball intended to use his sick leave or his vacation days to attend his physical therapy appointments.

66. Blythe had previously informed Ball that he had no leave available.

67. During the aforementioned meeting, Wells informed Ball that according to his leave records, Ball had twenty-one (21) days of available leave.

68. Approximately one (1) month after Ball returned to work, Almeida informed Wells that Ball had allegedly not properly logged his work assignments and had not followed protocol in responding to plumbing repairs.

69. In the seven (7) years Ball worked as a plumber for GWU, he had never received a complaint or a write-up prior to Almeida's aforementioned complaint to Wells.

70. If Ball's work assignment log appeared in any way improper, it was due to the fact GWU had not provided him with an iPhone, and therefore he was forced to

manually log his work on paper. However, Ball's assignment log properly reflected the work that he had performed.

71. Similarly situated non-disabled plumbers were provided iPhones or iPods and were not required to manually log their assignments on paper.

72. Almeida falsely accused Ball of not having responded to a call that Ball had already completed.

73. When Ball learned of Almeida's complaint to Wells that he had logged his assignments incorrectly, he met with her to discuss why she had complained to Wells rather than speaking directly with him first.

74. In response to Ball's aforementioned inquiry, Almeida yelled at him in a rage, threatened to talk to Speed, stomped upstairs to the supervisor's office, and left for the day.

75. On or about July 24, 2015, Ball was directed to meet with Claude Owens ("Owens"), the Senior Supervisor, and Wells.

76. During the aforementioned meeting, Owens and Wells confronted Ball about the work he performed on July 14, 2015, on the sixth floor of the Lafayette dorm.

77. Specifically, Owens and Wells accused Ball of being untruthful about the work he completed and also claimed the corresponding written paperwork for the jobs he completed contained false information.

78. Owens and Wells claimed Ball did not enter each dorm room to investigate any problems and that he only spoke to a woman on the sixth floor of the dorm and asked her whether there were any problems.

79. Owens and Wells further informed Ball that their allegations were supported by a videotape which depicted Ball slacking on the job and not doing any work.

80. Ball disputed the claims made by Owens and Wells, asked to see the aforementioned videotape, and asked Owens and Wells to inspect the repairs he completed on the sixth floor to prove he was truthful about the work he performed and that the content of his work log record was correct.

81. Owens and Wells ignored Ball's comments and then lodged another accusation, specifically that Ball failed to scan his identification badge to gain access to the dorm and therefore, he was never in the dorm or any of the rooms to perform any work.

82. Ball advised Owens and Wells that he used a key card rather than his identification badge to access the dorm and rooms on the sixth floor, and he offered to show Owens and Wells the key card containing details about the date and time he signed for the key card as well as usage details.

83. In response to Ball's offer to show the key card, Owens gathered all of his papers, terminated the meeting, and excused Ball.

84. After the July 24, 2015, meeting, Wells informed Ball that Speed disliked him for personal reasons, including but not limited to, the amount of FMLA leave Ball had used, wanted to terminate his employment, and warned Ball to expect further problems from him.

85. On August 4, 2015, five (5) business days after the July 24, 2015, meeting, Ball was directed to meet with a Human Resources representative.

86. During the aforementioned August 4, 2015, meeting, Ball was suspended without pay effective immediately pending an investigation of the allegations that he

falsified daily assignment sheets, loafed while on the clock, improperly clocked in and out from a cellphone, and was in unauthorized locations.

87. Approximately two days after Ball was suspended, Ball had an appointment with Dr. Byrne, who determined it was necessary for him to take an additional month of leave due to his injuries and his disability.

88. Ball immediately faxed the necessary paperwork regarding his medical leave to GWU.

89. On August 13, 2015, GWU officially terminated Ball's employment, effective immediately.

90. GWU allegedly commenced an investigation and wrongfully concluded that Ball falsified records based on several allegations as noted below.

91. On July 13, 2015, Ball was assigned to perform preventive maintenance in the Lafayette Building.

92. Ball's Daily Assignment Sheet allegedly reflected that he disconnected a garbage disposal and cleaned out trash from the disposal in Room 608 of The Lafayette Building. However, there is no such disposal room in The Lafayette Building.

93. When Ball was confronted with this alleged discrepancy during a meeting on August 4, 2015, with Owens and Speed, he explained that he cleaned the garbage disposal in the kitchen located in the basement of The Lafayette Building as well as the garbage disposal in Room 608 of South Hall.

94. GWU alleged that the video recording from the basement of The Lafayette Building from July 13, 2015, showed that Ball did not enter the basement at any time on that day.

95. Ball was not permitted to view the video or establish that he had completed all of the work he had been assigned.

96. Ball had performed the work that he represented in his assignment logs, and manually logged his work on paper as best he could in order to be consistent with the logs of similarly situated plumbers who had work-issued iPhones.

97. GWU understood Ball's logs and the work that he actually performed. Upon information and belief, GWU looked for minor deviations between Ball's manual logs and the digital logs of other plumbers in order to develop a pretextual reason to terminate Ball.

98. Upon information and belief, GWU knowingly misrepresented that a video discredited or disproved Ball's account of his work.

99. On July 14, 2015, Ball was assigned to perform preventive maintenance in The Lafayette Building.

100. Ball's Daily Assignment Sheet reflected that he performed the following maintenance during an eight-hour period of time: 601-Snake sink drain, 602-Snake sink and shower drain, 607-Check all plumbing found no issues, 600-Sink drain snaked, 606-Checked all plumbing adjusted toilet handle, 603-Snaked sink and shower drain, 604-Checked all plumbing found no issues.

101. GWU alleges that the sixth-floor video was viewed and allegedly showed that Ball did not perform any of the aforementioned work that was noted on his Daily Assignment Log.

102. Once again, Ball was not permitted to view the video or establish that he had completed all of the work he had been assigned.

103. Ball had performed the work described in his daily assignment sheet. Upon information and belief, GWU knowingly misrepresented that a video discredited or disproved Ball's account of his work.

104. Based on the above-noted allegations, Ball's employment as a GWU plumber was terminated for alleged violations of Facilities Services Working Rules (27), which states that: "An employee will at no time falsify any University records such as material request, I9 forms. Falsification of any University record will lead to disciplinary action up to and including termination."

105. Speed also alleged that Ball disregarded work rules, specifically from July 6, 2015, to July 29, 2015, Ball allegedly "clocked in and out" from a cell phone, which would be a violation of Facilities Working Rule (9).

106. Plumbers at GWU were required to clock in and out to log their time worked through the use of an automated phone service.

107. Plumbers would dial the automated phone service, and then when prompted entered an employee ID number to clock in and out in order to record their hours worked.

108. A known system error caused discrepancies in the time logs for numerous employees, including plumbers who were similarly situated to Ball.

109. Upon information and belief, this system error affected employee time logs from July 6, 2015 to July 29, 2015.

110. Upon information and belief, no corrective or disciplinary action was taken against similarly situated plumbers who had time log discrepancies similar to those alleged against Ball.

111. Ball clocked in and out to accurately reflect the time he worked from July 6, 2015 to July 29, 2015.

112. Ball is not aware whether or not the system error affected his time logs for the aforementioned time period. However, should any discrepancies for that time period exist, they resulted solely from the aforementioned system error.

113. The alleged violation of Working Rule (9) was pretextual, as Ball did not misrepresent the time he had worked.

114. Ball was never made aware if any investigation was conducted, who conducted the investigation, and if any investigation was completed.

115. The reasons given for Ball's termination were pretextual, as he did not violate the rules cited.

116. Ball was not permitted to review any documents or view the video that allegedly supported the allegations lodged against him.

117. After Ball was terminated as a GWU employee, he applied for unemployment compensation with the District of Columbia Department of Employment Services ("DC DOES").

118. DC DOES denied Ball's claim for unemployment compensation as a result of the findings Speed made to terminate his employment, specifically that Ball had falsified records and failed to properly follow procedure when signing in and out at work.

119. GWU withheld Ball's final paycheck.

120. Upon information and belief, from June 23, 2015, up until Ball was suspended and then terminated, Speed, Wells, Blythe, and Almeida engaged in a series of

acts to intentionally interfere with Ball's ability to perform his job duties in an attempt to effectuate his suspension and subsequent termination.

121. Upon information and belief, GWU employees, including but not limited to, Speed, Wells, Blythe and Almeida, worked to develop a pretextual reason for Ball's suspension and termination.

122. GWU failed, pursuant to the ADA, to make reasonable accommodations for Ball to perform duties that would not lead to any further injuries to his shoulder.

123. Ball labored under a hostile work environment from the time he returned to work at GWU on June 23, 2015.

124. GWU interfered with Ball's authorized leave that GWU owed to him, which would have enabled Ball to attend his physical therapy appointments without the condition of leave without pay.

125. GWU manufactured excuses to terminate Ball's employment due to the nature of his injury, his disability, and the amount of time he had been unable to work.

126. GWU has violated Ball's rights pursuant to the ADA, DCHRA and FMLA.

127. GWU has retaliated against Ball as a result of his engagement in protected activities.

128. GWU created a hostile work environment to prevent Ball from competently performing his duties.

## FIRST CLAIM FOR RELIEF
## DISABILITY DISCRIMINATION AND RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT OF 1990, 42 U.S.C. § 12101 *ET SEQ.*

129. Plaintiff incorporates by reference paragraphs 1 through 128 as if fully set forth herein.

130. Ball suffers from a diagnosed physical impairment that developed after he was the victim of a shooting in 1998.

131. Ball is a qualified individual under the ADA due to his diagnosed physical impairment that resulted from him being shot in 1998. This physical impairment substantially limited Ball's major life activities.

132. As a result of his disability, Ball experienced significant pain in his right shoulder, right ankle, and lower leg, particularly when he performed his plumbing duties.

133. At all relevant times herein, GWU had actual notice of Ball's aforementioned disability.

134. Ball underwent surgery on April 16, 2014, to remove bullet fragments lodged in his back and shoulders and to repair a torn rotator cuff.

135. Upon Ball's return to work, GWU made no arrangements for Ball to have the equipment necessary for him to fulfill his daily assignments.

136. GWU failed, pursuant to the ADA, to make reasonable accommodations for Ball to perform duties that would not lead to any further injuries to his shoulder.

137. Specifically, GWU denied Ball the ability to use his leave to attend his physical therapy appointments.

138. Ball was not provided with the following equipment issued to all other facility employees who were similarly situated to him; an iPhone or iPod to access or log his plumbing assignments, e-mail access, or a work-issued telephone to communicate with the supervisor and other facility employees.

139. The motivating factor for not providing Ball with the aforementioned equipment was his disability.

140. Upon information and belief, GWU intentionally did not provide Ball with the aforementioned equipment in order to prevent him from being able to perform his duties as a plumber.

141. Upon information and belief, GWU intentionally did not provide Ball with the aforementioned equipment in order to develop a pretextual reason to terminate Ball's employment.

142. According to personnel records, Wells informed Ball that GWU owed him twenty-one (21) days of leave.

143. Despite the fact that Ball had several leave days available, he was forced to take leave without pay to attend his physical therapy appointments.

144. As a result of the aforementioned situation, Ball had to forego two days' pay to attend two separate physical therapy appointments.

145. The motivating factor for GWU disallowing Ball to use his leave to attend his physical therapy appointments was Ball's injury and disability, which had previously caused him to miss several months of work.

146. When Ball was on leave pursuant to the ADA he engaged in a protected activity.

147. When Ball made leave requests due to his disability he engaged in a protected activity.

148. Upon information and belief, GWU terminated Ball in retaliation for his engagement in the aforementioned protected activities.

149. The motivating factor for Ball's termination was his disability.

150. GWU's reasons given for Ball's termination were pretextual. There was no legitimate, non-discriminatory reason for Ball's termination.

151. GWU's conduct amounts to discrimination against Ball based on his disability in violation of the ADA.

152. GWU's conduct amounts to retaliation against Ball for engaging in protected activities under the ADA.

153. GWU is liable for the violation of Ball's rights under the ADA.

**SECOND CLAIM FOR RELIEF**
**DISABILITY DISCRIMINATION AND RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE § 2-1401.01 *ET SEQ.***

154. Plaintiff incorporates by reference paragraphs 1 through 153 as if fully set forth herein.

155. Ball suffers from a diagnosed physical impairment that developed after he was the victim of a shooting in 1998.

156. Ball is a qualified individual under the ADA and DCHRA due to his diagnosed physical impairment that resulted from him being shot in 1998. This physical impairment substantially limited Ball's major life activities.

157. As a result of his disability, Ball experienced significant pain in his right shoulder, right ankle, and lower leg, particularly when he performed his plumbing duties.

158. At all relevant times herein, GWU had actual notice of Ball's aforementioned disability.

159. Ball underwent surgery on April 16, 2014, to remove bullet fragments lodged in his back and shoulders and to repair a torn rotator cuff.

160. Upon Ball's return to work, GWU made no arrangements for Ball to have the equipment necessary for him to fulfill his daily assignments.

161. GWU failed, pursuant to the DCHRA and the ADA, to make reasonable accommodations for Ball to perform duties that would not lead to any further injuries to his shoulder.

162. Specifically, GWU denied Ball the ability to use his leave to attend his physical therapy appointments.

163. Ball was not provided with the following equipment issued to all other facility employees who were similarly situated to him; an iPhone or iPod to access or log his plumbing assignments, e-mail access, or a work-issued telephone to communicate with the supervisor and other facility employees.

164. The motivating factor for not providing Ball with the aforementioned equipment was his disability.

165. Upon information and belief, GWU intentionally did not provide Ball with the aforementioned equipment in order to prevent him from being able to perform his duties as a plumber.

166. Upon information and belief, GWU intentionally did not provide Ball with the aforementioned equipment in order to develop a pretextual reason to terminate Ball's employment.

167. According to personnel records, Wells informed Ball that GWU owed him twenty-one (21) days of leave.

168. Despite the fact that Ball had several leave days available, he was forced to take leave without pay to attend his physical therapy appointments.

169. As a result of the aforementioned situation, Ball had to forego two days' pay to attend two separate physical therapy appointments.

170. The motivating factor for GWU disallowing Ball to use his leave to attend his physical therapy appointments was Ball's injury and disability, which had previously caused him to miss several months of work.

171. When Ball was on leave pursuant to the ADA he engaged in a protected activity.

172. When Ball made leave requests due to his disability he engaged in a protected activity.

173. Upon information and belief, GWU terminated Ball in retaliation for him engaging in the aforementioned protected activities.

174. The motivating factor for Ball's termination was his disability.

175. GWU's reasons given for Ball's termination were pretextual. There was no legitimate, non-discriminatory reason for Ball's termination.

176. GWU's conduct amounts to discrimination against Ball based on his disability in violation of the DCHRA.

177. GWU's conduct amounts to retaliation against Ball for engaging in protected activities under the DCHRA.

178. GWU is liable for the violation of Ball's rights under the DCHRA.

## THIRD CLAIM FOR RELIEF
## VIOLATIONS OF BALL'S RIGHTS PURSUANT TO THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. §2601, *ET SEQ.* INTERFERENCE-DISCRIMINATION/ RETALIATION

179. Plaintiff incorporates by reference paragraphs 1 through 178 as if fully set forth herein.

180. Ball was eligible to apply for and receive leave pursuant to FMLA.

181. On or about March 5, 2013, Ball applied for leave pursuant to FMLA due to the injuries he sustained in the 1998 shooting.

182. Ball was engaged in statutory protected conduct when he applied for and was granted leave pursuant to FMLA

183. GWU approved Ball's FMLA request beginning March 5, 2013, through April 16, 2013.

184. Ball requested additional leave under the FMLA as a result of the surgical procedure he underwent on April 16, 2014.

185. GWU approved Ball's additional FMLA leave from March 18, 2014, until May 18, 2014.

186. Based on Ball's request for leave pursuant to FMLA, he suffered adverse employment actions.

187. Upon his return to work, GWU made no arrangements for Ball to have the equipment necessary for him to fulfill his daily assignments.

188. GWU failed to make reasonable accommodations for Ball to perform duties that would not lead to any further injuries to his shoulder.

189. Despite the fact that Ball had leave days available, he was forced to take leave without pay to attend his physical therapy appointments when he returned to work following his surgical procedure.

190. GWU ultimately terminated Ball.

191. GWU intentionally created pretextual reasons to terminate Ball's employment due to the amount of time he had been unable to work while he was on FMLA leave.

192. The adverse employment actions that Ball suffered were directly related to his request for leave pursuant to the FMLA.

193. Ball's FMLA leave was the motivating factor for the adverse employment actions that he suffered.

194. GWU is liable for the violations of Ball's FMLA rights and for the retaliatory conduct that Ball experienced for exercising those rights.

195. Ball has been damaged due to the violations of his FMLA rights and the retaliatory conduct he experienced for exercising those rights.

196. GWU did not act in good faith as to any FMLA violations alleged herein, and the violations were intentional.

## FOURTH CLAIM FOR RELIEF
## WRONGFUL TERMINATION

197. Plaintiff incorporates by reference paragraphs 1 through 196 as if fully set forth herein.

198. At all times relevant herein, Ball was a member of a federally protected class.

199. Ball was wrongfully terminated on August 13, 2015, as he was terminated solely because he was disabled and engaged in protected activities by exercising his rights under the ADA, FMLA and DHCRA.

200. Terminating employees solely for being disabled and exercising their rights under the ADA, FMLA and DCHRA is a violation of public policy.

201. GWU intentionally created pretextual reasons to terminate Ball's employment due to his disability and the fact that he engaged in protected activities by exercising his rights under the ADA, FMLA and DHCRA.

202. The investigation conducted by GWU and the adverse actions taken against Ball give rise to an inference of wrongful termination.

203. Ball was terminated solely based on his injury, his disability, and the amount of time he had been unable to work.

204. GWU's termination of Ball is a violation of public policy.

205. GWU is liable for Ball's wrongful termination.

**FIFTH CLAIM FOR RELIEF**
**NEGLIGENCE**

206. Plaintiff incorporates by reference paragraphs 1 through 205 as if fully set forth herein.

207. GWU and its agents, including but not limited to, Blythe, Almeida, Owens, Wells and Speed, owed a duty to Ball under the ADA and DCHRA to provide him reasonable accommodations for his disability.

208. At all relevant times herein, Blythe, Almeida, Owens, Wells and Speed were acting within the scope and authority of their employment.

209. GWU and its agents breached this duty by failing to allow Ball to use his paid leave to attend physical therapy shortly after he returned to work on June 23, 2015.

210. The aforementioned breach proximately caused Ball to be harmed, as he had to forego two (2) days' pay.

211. GWU and its agents breached this duty by failing to provide Ball with the equipment necessary to complete and log his work as a plumber.

212. GWU and its agents breached this duty by failing to accommodate Ball's request for medical leave made on or about August 6, 2015.

213. GWU and its agents' breach of their duties to Ball proximately caused him to be terminated.

214. GWU is vicariously liable for the tortious actions of its employees alleged herein.

215. GWU is liable to Ball for negligence as set forth herein.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff Ball demands judgment against all defendants as follows:

I. Re-pleads and re-alleges paragraphs 1 through 215 with the same force and effect as if fully set forth herein;

II. Subject to further discovery, reserves the right to amend the complaint;

III. That the defendants be ordered to take appropriate affirmative acts to ensure that the acts complained of herein are not engaged in again by the defendants or any of its agents;

IV. That the defendants, including the officers, directors, agents, employees, and successors be permanently enjoined from discriminating or retaliating against any person;

V. An award of compensatory and punitive damages to plaintiff Ball.

VI. Back wages be awarded to plaintiff Ball, with interest.

VII. Front wages be awarded to plaintiff Ball, with interest.

VIII. Attorney's fees, costs, and prejudgment interest;

IX. Any other relief this Court deems just and fair;

Aaron Ball
By Counsel

Respectfully submitted,

*/s/ Billy L. Ponds*

Billy L. Ponds
Counsel for the Plaintiff
The Ponds Law Firm
Bar Number 379883
2101 L Street, N.W.
Suite 400
Washington, D.C. 20037
Telephone Number: (202) 333-2922
E-Mail: plfpc@aol.com

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

**AARON BALL** :
:
**Plaintiff** : **Civil Action Number**
: ____________________
**v.** :
:
**THE GEORGE WASHINGTON UNIVERSITY:**
:
**Defendant.** :
======================================

## JURY DEMAND

The plaintiff hereby requests request a trial by jury of twelve (12) on all triable issues, including the amount of damages to be awarded.

Aaron Ball
By Counsel

Respectfully submitted,

*/s/Billy L. Ponds*
Billy L. Ponds
Counsel for the Plaintiff
The Ponds Law Firm
Bar Number 379883
2101 L Street, N.W.
Suite 400
Washington, D.C. 20037
Telephone Number: (202) 333-2922
E-Mail: plfpc@aol.com