**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AARON BALL,

     *Plaintiff,*

v.

GEORGE WASHINGTON UNIVERSITY,

     *Defendant.*

No. 17-cv-507 (DLF)

**MEMORANDUM OPINION**

The plaintiff, Aaron Ball, brings this action against his former employer, George

Washington University, under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.

12101 *et seq.*, the District of Columbia Human Rights Act (DCHRA), D.C. Code § 2-1401.01 *et

seq.*, and the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. § 2601 *et seq.*  Before

the Court is the defendant's Motion for Summary Judgment, Dkt. 28.  For the reasons that

follow, the Court will grant the motion.

**I. BACKGROUND**

    **A.**    **Ball's Employment History and Requests for Medical and Disability Leave**

George Washington University (GW) employed Aaron Ball as a plumber from December

2008 until he was terminated on August 13, 2015.  Pl.'s Response to GW's Statement of

Material Facts (Pl.'s Response) ¶¶ 2, 205, Dkt. 29-1.[1]

---

[1] Unless otherwise noted, the facts in this section are drawn from undisputed portions of the
defendant's statement of material facts.  Because the plaintiff reproduced the defendant's
statements of fact next to his responses, the Court cites his response for ease of reference.

During Ball's employment, GW maintained several leave policies. *Id.* ¶¶ 6–7; 10–11. The FMLA gives eligible employees the right to take up "to twelve weeks of unpaid leave during any twelve-month period if a 'serious health condition' prevents [them] from performing [their] job functions." *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 151–52 (D.D.C. 2012), *aff'd sub nom. Hopkins v. Grant Thornton, LLP*, 529 F. App'x 1 (D.C. Cir. 2013). And the "DC counterpart" to the FMLA—called the "DCFMLA"—provides a similar right to take up to sixteen weeks of unpaid leave during any twenty-four month period. *Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 98 (D.D.C. 2016) (internal quotation marks omitted). GW allows its employees to take unpaid medical leave under both the FMLA and the DCFMLA. Pl.'s Response ¶ 9. If, after exhausting FMLA and DCFMLA leave, an employee is still unable to return to work, the employee may seek additional unpaid leave as an ADA or DCHRA accommodation. *Id.* ¶ 10.

Between March 5, 2013 and June 9, 2014, Ball requested and was granted over twenty-seven weeks of leave under the FMLA and DCFMLA. *Id.* ¶¶ 78, 81.[2] Ball then requested and was granted an additional six months of medical leave from June 9, 2014 to December 19, 2014 as an ADA accommodation. *Id.* ¶ 83.

On January 30, 2015, Ball again sought FMLA and DCFMLA leave, but GW denied his request because he had already exhausted his leave under both statutes. *Id.* ¶¶ 88–89. A few days later, on February 2, 2015, Ball requested leave again, this time as an ADA accommodation. *Id.* ¶ 90. GW granted Ball temporary leave from February 2, 2015 to March 11, 2015 so that GW and Ball could engage in the "interactive process" contemplated by the

---

[2] It appears that the basis for Ball's medical and disability leave was a shoulder injury. *See, e.g.*, Owens Decl. Ex. O at Ball_001117, Dkt. 28-4; Wells Tr. at 82:2–5, Dkt. 29-7.

ADA.  *Id.* ¶ 91; *see also* 29 C.F.R. § 1630.2(o)(3) (describing "an informal, interactive process" through which the employer and employee work together to identify a reasonable accommodation); *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (same).  During Ball's leave, on February 27, 2015, interim facilities director Harold Speed sent a letter to an Equal Employment Opportunity official at GW stating that extending Ball's leave as requested would impose an "undue hardship" on the facilities department.  *See* Pl.'s Opp'n Ex. 14 at Ball_000397, Dkt. 29-16.  The letter explained that GW's plumbing unit had already "been operating below capacity" for a year, with two other vacancies and another employee (besides Ball) on medical leave.  *Id.*  According to the letter, this shortage had already created a backlog of work orders that required available plumbers to work overtime to keep up with daily requests. *Id.*

When Ball's leave and the interactive process ended on March 11, 2015, GW denied Ball's request to remain on medical leave on the ground that granting the accommodation would impose an undue hardship on GW's operations.  Owens Decl. Ex. O., Dkt. 28-4.  Eight days later, on March 19, 2015, Ball became eligible for and requested leave under the FMLA and DCFMLA.  Pl.'s Response ¶ 92.  GW granted Ball leave from March 19, 2015 to June 10, 2015, when Ball's FMLA leave was exhausted.  *Id.* ¶¶ 92–93.  GW later extended Ball's leave through June 23, 2015 under the DCFMLA.  *Id.* ¶ 94.

On June 23, 2015, Ball returned to work.  *Id.* ¶¶ 94, 96.  His physician cleared him of all restrictions but recommended that he attend between two to three physical therapy appointments per week for his first few weeks back on the job.  *Id.* ¶¶ 94–95.  Although Ball did not have any annual or sick leave available, GW let him take unpaid leave for a few hours on June 23 and again on June 25 and June 26.  *Id.* ¶¶ 99–100.  In early July, Ball began regular physical therapy

appointments on Mondays and Wednesdays.  *Id.* ¶¶ 101–02.  On July 7, 2015, Ball requested "intermittent" medical leave under the FMLA and DCFMLA to accommodate his physical therapy schedule.  *Id.* ¶ 105.  GW denied Ball's request under the FMLA because he had exhausted his FMLA leave, but it granted his request under the DCFMLA.  *Id.* ¶ 106.  Later, on August 7, 2015, Ball requested continuous leave under the DCFMLA.  *Id.* ¶ 203.  By that time, however, GW had suspended Ball pending an investigation into potential workplace misconduct, as discussed below.  *Id.*

Ultimately, GW denied Ball's final request for DCFMLA leave.  *Id.* ¶ 204.  GW insists that it did so because Ball "was on an unpaid suspension, was not scheduled to work, and thus had no need for leave," but Ball maintains that he "still had a medical need for the leave" and that GW really denied his request to strip him of "job protection."  *Id.*  Six days after Ball's final leave request, GW terminated him on August 13, 2015.  *Id.* ¶ 205.  GW informed Ball that the termination was based on GW's conclusions that he had "falsified his work assignment logs, regularly clocked in and out from a cell phone in violation of University policy, and engaged in a pattern of disregarding work rules."  *Id.* (internal quotation marks omitted).  Ball agrees that "those were the reasons proffered by GW" but maintains that GW in fact terminated him because of his disability, and as retaliation for his requests for medical leave.  *Id.*; Pl.'s Opp'n at 17, Dkt. 29.

**B.      GW's Investigation of Ball's Potential Workplace Misconduct**

GW's disciplinary policy provides that GW may terminate employees either as the last step in a progressive discipline process "or immediately if the employee's conduct, in GW's judgment, warrants immediate termination."  Pl.'s Response ¶ 21.  When GW suspects an employee of misconduct, the employee's supervisor will typically conduct an initial review.  *Id.* ¶ 28.  If that review suggests a need for disciplinary action, the supervisor then seeks "review

and advice" from the HR representative responsible for the employee's work unit. *Id.* "If, in the HR representative's judgment, the suspected infraction is serious," the representative may recommend that the supervisor suspend the employee pending an investigation by the HR representative. *Id.* ¶ 29. If the results of the HR investigation warrant termination, the HR representative will recommend termination to the employee's "division head," who then decides whether to terminate the employee. *Id.* ¶ 30.

GW's disciplinary policy lists "dishonesty, falsification of records, stealing, and sleeping on the job as infractions that may result in immediate termination." *Id.* ¶ 22. GW's plumbers must also comply with the facilities department's "Work Rules," designed to keep staff accountable for their work, time, and whereabouts. *Id.* ¶ 23. The work rules prohibit employees from, among other things, "loafing" during work hours, entering certain areas in University residence halls, working outside of their assigned work locations without supervisor approval, and falsifying University records. *Id.* ¶ 26. They also require employees to "take reasonable directions" from their supervisors, and they warn that the failure to do so may result in termination. *Id.* ¶ 27 (internal quotation marks omitted). Finally, the work rules require employees to "punch in or call in" from particular locations designated by a supervisor "so that supervisors can verify that employees have actually reported to work when the employees say they have." *Id.* ¶ 24 (internal quotation marks omitted). GW contends that its plumbers are specifically required to clock in from a landline located on campus, but Ball disputes that this policy existed and maintains that he was never instructed to clock in from a landline. *Id.* ¶ 25.

During Ball's employment, he reported to plumbing supervisor Thomas Wells, who reported to the interim director of the facilities department, Harold Speed. *Id.* ¶ 44. Claude Owens and Marion Flythe served as the facilities department's HR representatives. *Id.* ¶ 45.

Shortly after Ball returned to work on June 23, 2015, he was investigated for potential workplace misconduct. To understand that investigation, it is first helpful to know a few things about GW's technology and procedures.

First, GW issues each of its employees a "GWorld card" that allows the employee to enter secure University buildings by swiping the card in a card reader at the building's entrance. *Id.* ¶¶ 31–33. All GW buildings relevant to this suit are secured with GWorld card readers that record every card swipe, along with the cardholder's unique "Patron ID." *Id.* ¶¶ 32–33, 35. In addition, each building has a second "GWorld card swipe point inside the entrance that is intended to prevent piggybacking by requiring visitors to swipe their GWorld card twice when entering the building." *Id.* ¶ 36. GW contends that its employees are specifically instructed not to let others follow them into University buildings or to lend their GWorld cards to others, but Ball maintains that "[p]iggybacking was the custom at GW" and that "there was no enforced official policy against" it. *Id.* ¶ 34.

Second, GW uses a CCTV video surveillance system to monitor certain buildings. *Id.* ¶¶ 39–42. The system records footage temporarily to a hard drive. *Id.* ¶ 42. When the hard drive is full, new footage automatically overwrites old footage "on a 'first-in, first-out' basis." *Id.*

Third, GW's plumbing unit uses a software program called "AiM" that enables customers to submit requests and supervisors to assign work orders. *Id.* ¶¶ 49–50. The system was designed in part to help supervisors "hold their staff accountable for their time" and to "identify employees who we[re] fudging timecards." *Id.* ¶ 50 (alteration adopted and internal quotation marks omitted). In July 2015, plumbers accessed AiM using GW-issued iPods. *Id.* ¶ 51. Typically, the plumbing supervisor would send daily work assignments to each plumber's iPod,

*id.* ¶ 55, and the plumbers would "view their assignments, record their completed tasks, and record the amount of time they spent on each task" using the AiM software, *id.* ¶ 56. To GW, it was imperative that all plumbers "accurately record[ed] their completed assignments and the amount of time they spent on each task" because the facilities department "bill[ed] the cost of all labor hours, materials, and equipment" to the division within GW that served as the "customer" for the project. *Id.* ¶ 58.

When Ball returned to work in June 2015, he did not have an iPod. *Id.* ¶ 110; Pl.'s Statement of Material Facts in Dispute (Pl.'s Statement) ¶ 6, Dkt. 29-1. The reason remains in dispute. According to GW, Ball had forgotten his email username and password, and Wells told him he had to visit the IT desk at the library to get them reset before he could obtain an iPod. Pl.'s Response ¶¶ 110–11. GW also claims that Ball lied to Wells by claiming he had visited the library multiple times for assistance when he had not. *Id.* ¶¶ 113, 120. Ball, however, maintains that he was never told to visit the library and never claimed to have done so. Ball Decl. ¶¶ 8–9, Dkt. 29-5. Rather, he was told that the individual in charge of setting iPods was on vacation and that Wells would take care of getting Ball an iPod when the individual returned. *Id.* ¶ 10.

Regardless of the reason, Ball's lack of an iPod meant Wells had to place paper copies of Ball's work assignment logs in Ball's mailbox each day. Pl.'s Response ¶ 112. Ball would then fill the logs out by hand and give them to a co-worker, Silene de Almeida, to input into AiM. *Id.* ¶ 115. After a few weeks of this process, de Almeida told Wells that Ball had been charging an inordinate amount of time to an expired work order for a single building named Lafayette Hall.

Wells Tr. at 61:7–64:9, Dkt. 28-20.[3]  After speaking with de Almeida, Wells began an initial

review of Ball's work assignment logs to determine whether Ball had violated GW's policies or

the facilities department's work rules.  Pl.'s Response ¶ 117.  In the course of his investigation,

Wells reviewed video surveillance footage, GWorld card swipe records, daily assignment logs,

physical key checkout records, and "written documentation provided by [Ball] directly."  GW Tr.

Ex. 1 at Ball_001303, Dkt. 28-9.  When he finished, Wells submitted a memorandum to HR on

July 27, 2015 summarizing his conclusions.  Pl.'s Response ¶ 119.  The memo stated that:

- Ball was told to visit the library to get his email password reset, but he claimed he
  could not do so because nobody was manning the IT desk.  Wells considered this
  explanation a lie and an act of "insubordination" because there was "always
  someone at [the IT] desk during business hours."  GW Tr. Ex. 1 at Ball_001302.

- Ball's GWorld swipe records and video surveillance footage showed that Ball
  spent significant time in a TV lounge in Guthridge Hall even though Ball had no
  work assignments in that building and "no reason to be there."  Id.  Specifically,
  Ball entered Guthridge Hall ten times in five days and stayed there for
  approximately twenty-four hours.  Id.[4]

---

[3] Ball attempts to dispute this fact but does not point to any relevant, admissible evidence that
would create a genuine issue for trial.  A dispute is "genuine" only if a reasonable jury could
determine that the evidence warrants a finding for the non-moving party, *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986), and genuine disputes must be based on evidence that
would be admissible at trial, Fed. R. Civ. P. 56(c).  Ball claims that de Almeida complained only
that it was burdensome for her to input Ball's work logs and not that the logs contained
suspicious time entries.  *See* Pl.'s Response ¶ 116.  But to support that claim, Ball points only to
his own deposition testimony, which says nothing about any conversation between de Almeida
and Wells, *see* Ball Tr. at 22:13–23:17, Dkt. 29-6, and Owens's deposition testimony, which
consists solely of inadmissible hearsay about what Wells told Owens about their conversation
and does not say one way or the other whether de Almeida shared concerns about Ball's time
entries, *see* Owens Tr. at 49:19–50:16, Dkt. 29-25.  Wells, on the other hand, testified
unequivocally that de Almeida raised concerns about Ball's time entries, prompting Wells to
review them.  *See* Wells Tr. at 61:7–64:9, Dkt. 28-20.

[4] Ball does not dispute that Wells's memo contained these allegations, though he disputes the
accuracy of the allegations themselves.  *See* Pl.'s Response ¶¶ 120–22, 124–25.

The work logs and GWorld card records on which Wells purported to rely are undisputed. They indicate that:

- Ball entered the Guthridge Hall basement fifty-five times between June 29, 2015 and July 30, 2015. Pl.'s Response ¶ 130.

- On at least eight days during that time period, Ball entered the Guthridge Hall basement before his shift ended and did not use his GWorld card to swipe into any other GW building for the rest of his shift. *Id.* ¶ 131.

- On July 2, 2015, Guthridge Hall was the only GW building Ball entered using his GWorld card, even though he had no work assignments in Guthridge Hall that day. *Id.* ¶ 132.

- On July 6, 2015, Ball recorded two hours of work in Munson Hall and two hours of work in Jacqueline Bouvier Kennedy Onassis Hall (JBKO). *Id.* ¶ 134. Ball used his GWorld card to enter Munson Hall only once, at 9:42 A.M., and swiped into Madison Hall, where Ball had no work assignments, nine minutes later. *Id.* ¶ 135. Ball never used his GWorld card to enter JBKO that day. *Id.* ¶ 136. He entered the Guthridge Hall basement at 11:44 A.M. and did not use his GWorld card to enter any other buildings between then and the end of his shift. *Id.* ¶ 138.

- On July 7, 2015, Ball recorded seven completed work orders in Lafayette Hall, Rice Hall, Munson Hall, and Madison Hall. *Id.* ¶ 139. Ball never used his GWorld card to enter Lafayette Hall, Munson Hall, or Madison Hall that day. *Id.* ¶ 140. However, he used his GWorld card to enter the Guthridge Hall basement three times. *Id.* ¶ 143.

- On July 13, 2015, Ball recorded six-and-a-half hours of work in Lafayette Hall, which he charged to a "preventive maintenance work order" from the previous fiscal year. *Id.* ¶ 144. Ball's handwritten work log states that he repaired a garbage disposal in Room 608 of Lafayette Hall, but there is no Room 608 in Lafayette Hall. *Id.* ¶¶ 145–46. Ball never used his GWorld card to swipe into Lafayette Hall that day. *Id.* ¶ 148. Ball entered Munson Hall at 2:01 P.M., even though he did not report any completed work assignments in Munson Hall that day. *Id.* ¶¶ 150–51.

- On July 14, 2015, Ball recorded eight hours of preventive maintenance in seven rooms in Lafayette Hall. *Id.* ¶ 152. Ball never used his GWorld card to enter Lafayette Hall that day. *Id.* ¶ 156. But he did use his GWorld card to enter the Guthridge Hall Basement at 8:16 A.M., Francis Scott Key Hall (FSK) at 9:41 A.M., the Potomac residence hall at 9:54 A.M., a support building at 9:55 A.M., the Guthridge Hall Basement at 10:00 A.M., the Potomac residence hall at 10:18 A.M., and JBKO at 10:43 A.M. and 2:06 P.M. *See* Owens Decl. Ex. W. at Ball_001411, Dkt. 28-4. According to Wells's memo, Ball checked out a key for

Lafayette Hall at 9:56 A.M. and returned it just over five hours later, at 3:09 P.M. Pl.'s Response ¶ 157.

- On July 15, 2015, Ball recorded another seven-and-a-half hours of preventive maintenance in Lafayette Hall. *Id.* ¶ 161. Ball checked out a key for Lafayette Hall that day, but never used it to enter Lafayette Hall. *Id.* ¶ 162. He used his GWorld card to enter Lafayette Hall only once that day, at 11:04 A.M., and he exited less than three hours later. *Id.* ¶ 163.

Wells also reviewed surveillance footage from GW's CCTV system during his investigation. *Id.* ¶ 126.[5] The footage showed, for example, that Ball entered the Guthridge Hall basement lounge on July 13, 2015 at 9:34 A.M. and stayed there until 10:29 A.M. *Id.* Ball did not clock out during that time, even though he had no assignments in Guthridge Hall that day, or any other day. *Id.* ¶¶ 127–28.

According to Wells, the footage also showed that, on July 14, 2015—when Ball reported eight hours of preventive maintenance on the sixth floor of Lafayette Hall—Ball entered the sixth floor of Lafayette Hall only once, at 11:23 A.M., and exited Lafayette Hall less than two hours later. *Id.* ¶ 153; GW Tr. Ex. 1 at Ball_001306–07; *see also id.* Owens Decl. Ex. Z. at Ball_000317–21, Dkt. 28-5 (screenshots of footage showing Ball's entrance and exit, with timestamps). Ball disputes this fact on the ground that he did perform eight hours of preventive maintenance work in Lafayette Hall on July 14, 2015. *See* Pl.'s Response ¶ 153; Ball Decl. ¶¶ 29–30. But he does not say how many times, or when, he entered Lafayette Hall (or the sixth floor) that day. Ball Decl. ¶¶ 29–30.

---

[5] Ball objected to this surveillance footage on spoliation grounds and filed a motion for sanctions asking the Court to draw an adverse inference from the fact the footage is no longer available. *See* Pl.'s Mot. for Sanctions, Dkt. 24. The Court denied the motion because the footage was overwritten in the ordinary course of business before any legal obligation to preserve the footage arose. *See* Sept. 27, 2018 Mem. Op. & Order, Dkt. 32. Consistent with that decision, the Court will not draw an adverse inference from the footage's unavailability and will consider Wells's and Owens's testimony about what they personally observed when reviewing the footage, to the extent that testimony is uncontradicted by other evidence in the record.

Wells recommended Ball's termination based on the conclusions contained in his memo. Pl.'s Response ¶ 164. After HR received the memo, Owens—one of the HR representatives assigned to the facilities department—initiated a follow-up investigation. *Id.* ¶ 165. During this second investigation, Wells and Owens met with Ball several times in July "to give him an opportunity to address his apparent misconduct." *Id.* ¶ 166. During one meeting, they told Ball he could not have fixed a garbage disposal in Room 608 of Lafayette Hall, as he claimed to have done on July 13, 2015, because no such room existed. *Id.* ¶ 167. Ball responded that he had actually repaired two garbage disposals: one in the basement kitchen of Lafayette Hall and the other in Room 608 of South Hall. *Id.* ¶ 168. But Ball did not use his GWorld card to enter South Hall on July 13, 2015, and no other keys for South Hall existed. *Id.* ¶ 169–70. In addition, Wells and Owens reviewed surveillance footage of Lafayette Hall's basement kitchen. *Id.* ¶ 171. They maintain that the footage confirmed that Ball never entered the Lafayette Hall basement, *id.*, but Ball insists that he did "disconnect and clean the garbage disposal in the basement" that day, *see* Ball Decl. ¶ 26. Wells also checked to see whether Ball had ordered any parts for the Lafayette Hall basement garbage disposal and discovered that he had not. Pl.'s Response ¶ 175.

Wells and Owens viewed the July 14, 2015 footage together, which showed Ball entering Lafayette Hall's sixth floor at 11:23 A.M. and exiting at 1:08 P.M. *Id.* ¶ 176.[6] Wells and Owens also told Ball in a meeting that the video showed that he had not entered each of the seven rooms in which he claimed to have made repairs on July 14. *See* Ball Tr. at 164:8–15, Dkt. 29-6. Ball responded to these apparent discrepancies by sticking with his written work report and maintaining that he completed all the work he claimed to have completed that day. Pl.'s

---

[6] Ball disputes this fact, but solely on the basis of his motion for sanctions, which the Court has denied.

Response ¶ 178; *see also* Ball Tr. at 164:14–15, Dkt. 29-6.  After the meeting, Wells inspected the sixth floor rooms where Ball claimed to have worked and found no evidence that Ball performed any of the tasks he had recorded for July 14, 2015.  *Id.* ¶ 179.

In early August, Owens also learned that Ball had regularly clocked in and out from a cell phone instead of a landline.  *Id.* ¶¶ 182, 187, 189.  It is undisputed that Owens believed that clocking in and out from a cell phone was equivalent to "stealing hours," although Ball maintains that no one ever instructed him not to do so.  *Id.* ¶¶ 190, 192; Ball Decl. ¶¶ 2–4.

At Owens's request, GW suspended Ball on August 4, 2015 pending the completion of Owens's investigation.  Pl.'s Response ¶ 192; *see also* Pl.'s Opp'n Ex. 2, Dkt. 29-4 (suspension letter).  On August 11, 2015, Owens recommended Ball's termination.  Pl.'s Response ¶¶ 201–02.  Owens stated that he had "completed [his] investigation" into the allegations of Ball "falsifying his work assignments, not being in his work location and clocking in and out on a cellphone" and had "found that all of the allegations [we]re true."  GW Tr. Ex. 5 at Ball_000251, Dkt. 28-9; *see also* Pl.'s Response ¶¶ 201–02.  GW terminated Ball on August 13, 2015, purportedly "based on its conclusion that Ball had falsified his work assignment logs, regularly clocked in and out from a cell phone in violation of University policy, and engaged in a pattern of disregarding work rules."  Pl.'s Response ¶ 205 (internal quotation marks omitted); *see also* Owens Decl. Ex. DD. at Ball_000301–02, Dkt. 28-7 (termination letter).

## C.  Procedural History

Ball filed an EEOC charge on January 12, 2016, which EEOC dismissed on February 7, 2017.  Pl.'s Response ¶¶ 207, 209.  Ball filed this action on March 20, 2017.  Dkt. 1.  The Court previously granted a motion in limine filed by GW seeking to exclude certain expert testimony not considered here.  *See* Aug. 23, 2018 Mem. Op. & Order, Dkt. 31.  The Court also denied a motion for sanctions filed by Ball seeking to exclude testimony about GW's surveillance footage

on spoliation grounds and requesting that the Court draw an adverse inference from the footage's deletion. *See* Sept. 27, 2018 Mem. Op. & Order. The Court now resolves GW's motion for summary judgment.

## II. LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Liberty Lobby*, 477 U.S. at 247–48. A "material" fact is one with potential to change the substantive outcome of the litigation. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. "If there are no genuine issues of material fact, the moving party is entitled to judgment as a matter of law if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Holcomb*, 433 at 895 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe," *id*. at 151, and it "is . . . to believe[ ]" "[t]he evidence of the non-movant," *Liberty Lobby*, 477 U.S. at 255.

At the same time, to win at summary judgment a defendant "need only identify the ways in which the plaintiff has failed to come forward with sufficient evidence to [allow] a reasonable

jury to find in her favor on one or more essential elements of her claim." *Grimes v. District of Columbia*, 794 F.3d 83, 93 (D.C. Cir. 2015); *see also Celotex*, 477 U.S. at 323–325. And while the defendant bears this burden of establishing that the plaintiff lacks sufficient evidence, the defendant need not produce any evidence of its own. The plaintiff, meanwhile, "cannot rely on the allegations of her own complaint in response to a summary judgment motion, but must substantiate them with . . . evidence that a reasonable jury could credit in support of each essential element of her claims." *Grimes*, 794 F.3d at 94. The plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and must establish that the evidence is not "so one-sided that reasonable men and women must find" for the defendant, *Radtke v. Lifecare Mgmt. Partners*, 795 F.3d 159, 166 (D.C. Cir. 2015). All factual positions at summary judgment must be supported by "admissible" evidence. Fed. R. Civ. P. 56(c). "[S]tatements that are impermissible hearsay or that are not based on personal knowledge are precluded from consideration by the Court." *Riggsbee v. Diversity Servs.*, 637 F. Supp. 2d 39, 46 (D.D.C. 2009) (citing *Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007)).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). But, in sum, summary judgment is appropriate when "the parties agree about the facts—what happened—and the court accepts the movant's view of the legal implications of those facts, or[] . . . when a putatively disputed body of evidentiary material could not, even assuming a sympathetic factfinder, reasonably support a finding crucial to the nonmoving party's legal position." *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).

### III. Analysis

Ball's claims largely focus on a single issue: whether the reasons GW gave for terminating him were its actual reasons or merely a pretext for unlawful discrimination or retaliation. GW insists that it terminated Ball because it believed he had falsified work reports and violated work rules, and the Court must decide whether Ball has produced enough evidence to allow a jury to conclude otherwise. The Court will first address Ball's claims under the ADA and its DC equivalent, the DCHRA, before turning to Ball's related claims under the FMLA and, finally, his claims for wrongful termination and negligence.

### A.    Ball's ADA and DCHRA Claims

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to" the "discharge of employees" or the "privileges of employment." 42 U.S.C. § 12112(a). The DCHRA similarly makes it unlawful for an employer to discharge an employee "wholly or partially for a discriminatory reason based upon . . . disability." D.C. Code § 2–1402.11(a). Both the ADA and DCHRA also prohibit employers from terminating employees as retaliation for engaging in protected activity under those statutes. *See* 42 U.S.C. § 12203(a); D.C. Code § 2–1402.61. Given the similarities between the ADA and the DCHRA, the D.C. Court of Appeals looks to decisions construing the ADA for guidance when applying the DCHRA. *See Hunt v. District of Columbia*, 66 A.3d 987, 990 (D.C. 2013) ("Our decisions under the DCHRA regarding whether an employee was discriminated against because of a 'disability' effectively incorporate judicial construction of related anti-discrimination provisions of the [ADA].").

Where, as here, a plaintiff relies on circumstantial, rather than direct, evidence of discrimination under the ADA or the DCHRA, the burden-shifting framework set out in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), applies. *See Giles v. Transit Employees Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) (ADA discrimination); *Smith v. District of Columbia*, 430 F.3d 450, 454–55 (D.C. Cir. 2005) (ADA retaliation); *Ottenberg's Bakers, Inc. v. D.C. Comm'n on Human Rights*, 917 A.2d 1094, 1102 (D.C. 2007) (DCHRA discrimination); *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 235–36 n. 3 (D.C. Cir. 1999) (DCHRA retaliation).

Under that framework, the plaintiff "bears the initial burden of demonstrating a prima facie case" of retaliation or discrimination, and the burden then shifts to the employer to articulate a "legitimate, non-discriminatory reason for the challenged action." *Giles*, 794 F.3d at 5. At summary judgment, however, the plaintiff's prima facie case "is almost always irrelevant" because "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). If so, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Id.* at 494. Instead, "the district court must conduct one central inquiry[:] whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory [and non-retaliatory] reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the plaintiff on a prohibited basis." *Adeyemi v. D.C.*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

One way an employee can show that the employer's proffered reason was pretextual is by demonstrating "that the employer is making up or lying about the underlying facts that formed the predicate for the employment decision," such as poor performance or workplace misconduct. *Brady*, 520 F.3d at 495. In such cases, "[t]he question is not whether the underlying [conduct] occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the

underlying [conduct] occurred." *Id.* at 496. "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Id.* at 495.

The D.C. Circuit has stressed that courts should tread carefully when evaluating employers' personnel decisions. Courts do not review "the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations adopted and internal quotation marks omitted). "Evidence indicating that an employer misjudged an employee's performance" is "relevant to the question whether its stated reason is a pretext masking prohibited discrimination" or retaliation, but generally only "if the employer made an error too obvious to be unintentional." *Id.* In making that determination, the court "must beware of using 20/20 hindsight." *Id.* What may seem like a "hair-trigger" or "aggressive[]" reaction to employee misconduct does not necessarily imply discrimination, especially if the reaction is part of a "strict[] and uniform[]" enforcement policy. *Brady*, 520 F.3d at 496. "It is not the Judiciary's place to micro-manage an employer's [workplace misconduct] policies," and "courts are generally less competent than employers to restructure business practices." *Id.* (alteration adopted and internal quotation marks omitted). "[U]nless mandated to do so by congress they should not attempt it." *Id.* (internal quotation marks omitted).

Here, there is no question that GW has proffered a legitimate, non-discriminatory and non-retaliatory reason for terminating Ball. As explained in Owens's termination letter and in more detail in Wells's July 27 memo, GW insists that it terminated Ball based on its conclusion that he had falsified documents, squandered work time in unauthorized locations, clocked into work using a cell phone, and lied to Owens and Wells about his conduct. *See* Pl.'s Response

¶¶ 118–19, 205; Owens Decl. Ex. DD. at Ball_000301 (termination letter); GW Tr. Ex. 1 at

Ball_001302 (Wells's July 27 memo); *see also* GW's Br. at 21, Dkt. 28; Pl.'s Opp'n at 13

(conceding that GW "has asserted legitimate, non-discriminatory reasons for the termination of

Plaintiff"). There is no dispute that at least some of the conduct Ball was accused of would

violate GW's work policies and warrant immediate termination if it occurred.[7] And there is also

no dispute that GW has terminated multiple non-disabled employees within the facilities

department for the same conduct Ball was accused of: submitting false work records and

violating work rules. Pl.'s Statement ¶ 191; *see also* GW Tr. Ex. 37 at Ball_001399–400,

Ball_001402–3, Ball_001405–06, Dkt. 28-9 (termination letters to other, non-disabled

employees).

The sole question therefore becomes whether the plaintiff has provided sufficient

evidence from which a jury could conclude GW's proffered reasons were pretextual. He has

not.[8]

---

[7] The only exception is clocking in using a cell phone, which Ball maintains was a common practice and did not violate any rule or instruction. Ball Decl. ¶¶ 2–4. But a dispute about one of the reasons offered for an employee's termination does not defeat other reasons that would independently warrant termination. *See Davis v. George Washington Univ.*, 26 F. Supp. 3d 103, 119 (D.D.C. 2014). Because the other allegations against Ball, if true, would justify GW's decision to terminate him, the Court need not wade into the parties' disagreement over the plumbing unit's purported clock-in policy. That said, the Court notes that even if GW did not have a policy prohibiting Ball from clocking in using a cell phone, it is undisputed that Wells— the individual responsible for recommending Ball's termination and drafting his termination letter—personally "believed" that clocking in from a cell phone was equivalent to "stealing hours." Pl.'s Response ¶ 190. That fact alone might well establish a good faith belief on the part of the central decisionmaker, even if that belief "turn[ed] out to be false." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).

[8] In reviewing the record, GW urges the Court to disregard Ball's "self-serving" and uncorroborated declaration attached to his opposition. *See* Def.'s Reply, Dkt. 30 at 3–6. But the D.C. Circuit has disavowed that approach, particularly in employment-discrimination cases where an employee's uncorroborated testimony will frequently be the only evidence available.

Ball points to six facts that make GW's justification for his termination "not so clear cut." Pl.'s Opp'n at 13. The Court will address each in turn, though it is careful to consider them cumulatively and not in isolation. *First*, Ball points to the fact Owens drafted a hardship letter in response to Ball's February 2015 request for an ADA accommodation, and he emphasizes that his direct supervisor, Wells, had no knowledge of GW's attempt to assert undue hardship and believed that the plumbing unit could have handled Ball's leave request. *Id.* at 14. Giving Ball's brief a generous reading, he may mean one of two things. He could be arguing that the hardship letter was based on false information and was therefore itself a pretext for underlying discrimination or retaliation. Or, he could mean that GW's genuine belief that accommodating Ball's leave requests would impose an undue hardship revealed a motive to get rid of Ball when he returned from his leave in June. Both arguments are unpersuasive.

Ball's suggestion that the undue hardship letter was based on false information is foreclosed by the record. Ball relies solely on Wells's deposition testimony, *see* Pl.'s Statement ¶¶ 3–4, which stated that Wells was unaware of GW's decision to assert undue hardship and that he personally believed that the plumbing unit could have carried on during Ball's absence, *see* Wells Tr. at 84:22–85:13, Dkt. 29-7. But Wells also testified unequivocally that the numbers

---

*See Scott v. Dist. Hosp. Partners L.P.*, 715 F. App'x 6, 7 (D.C. Cir. 2018); *Johnson*, 823 F.3d 710. The Court therefore will not in any way ignore or discount Ball's testimony. It will, however, disregard Michele Tyner's declaration, Dkt. 29-30, both because she was not identified as a witness during discovery, *see* Fed. R. Civ. P. 37(c)(1); *Thomas v. Paulson*, 507 F. Supp. 2d 59, 80 (D.D.C. 2007), and because its contents are not based on personal knowledge, *see* Fed. R. Civ. P. 56(c)(4). The decision to disregard her testimony, however, does not affect the Court's analysis because the two primary components of her testimony—that following others into card-secured buildings was a common practice and that GW did not prohibit its plumbers from clocking in from a cell phone—are immaterial. The Court can assume those two facts are true because they do not prove that GW's reasons for Ball's termination were pretextual.

relied on in Owens's hardship letter "seem[ed] accurate." Wells Tr. at 108:8, Dkt. 29-7. Those numbers showed three vacancies out of eleven positions—plus a temporary absence for medical leave—and a resulting backlog that required weekly overtime work by every available plumber just to keep up with incoming requests. Pl.'s Opp'n Ex. 14 at Ball_000397. There is no evidence in the record suggesting that these figures were in any way incorrect. Given the facts underlying the hardship letter—which are not subject to genuine dispute—a reasonable juror could not conclude that GW's claim of hardship was made in bad faith.

To the extent Ball argues that even a genuine assertion of undue hardship demonstrated a discriminatory motive, he is incorrect. The ADA clearly contemplates that employers can deny requests for accommodation that would "impose an undue hardship on the operation of the business of" the employer. *Flemmings v. Howard Univ.*, 198 F.3d 857, 860 (D.C. Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)). And when employers are presented with accommodation requests that would impose an undue hardship, they are encouraged to engage in an "informal, interactive process" with the qualified employee to identify an appropriate accommodation. *Morris v. Jackson*, 994 F. Supp. 2d 38, 47 (D.D.C. 2013) (internal quotation marks omitted). GW did just that. It considered Ball's request and granted him leave while it engaged him in the interactive process envisioned by the ADA. That GW availed itself of the collaborative process established by the ADA is not evidence that it harbored a discriminatory motive. If it were, the ADA's shield for employers facing undue hardship would become a sword and convert a defense against a failure-to-accommodate claim into liability for a claim of discrimination or retaliation. Unsurprisingly, courts have rejected that approach and repeatedly granted employers summary judgment on discrimination or retaliation claims in cases where the employer had previously denied accommodation requests and asserted undue hardship. In *Graffius v. Shinseki*, for

example, the employer denied an employee's requests for accommodations and later terminated the employee for multiple unexcused absences. 672 F. Supp. 2d 119, 122–24 (D.D.C. 2009). The court rejected the employer's assertion of undue hardship and allowed most of the plaintiff's failure-to-accommodate claims to proceed to trial. *Id.* at 127–29. Even so, the court found that the employer's reason for terminating the employee months later was not pretextual. *Id.* at 131–33; *see also, e.g.*, *Senatore v. Lynch*, 225 F. Supp. 3d 24, 35–39, 41 (D.D.C. 2016) (finding no evidence of pretext even though employer had denied several accommodation requests before terminating the employee); *Bumpus v. Middle Georgia Reg'l Comm'n*, No. 5:16-CV-326, 2018 WL 4053325, at *6 (M.D. Ga. Aug. 24, 2018) (finding no evidence of pretext even though employer had written a letter stating that the employee would not be granted any additional leave because her position "was critical" and reasoning that "whether or not [the employee's] position was 'critical' d[id] not show that the proffered reason for terminating her employment a month later—giving false information—was pretextual or evidence of discrimination"). Here, as in *Graffius*, *Senatore*, and *Bumpus*, GW's previous assertion of undue hardship in February did not show that the reason for terminating Ball—violating work rules—months later, in August, was a pretext.

*Second*, Ball points to the temporal proximity between his eligibility and requests for leave and GW's adverse employment actions. Ball concedes that temporal proximity generally cannot establish pretext, but he argues that it can if the events "are 'very close' in time." Pl.'s Opp'n at 14 (quoting *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007)). He is mistaken. He relies on language from *Woodruff*, but the language he quotes comes from the portion of the opinion dealing with the plaintiff's prima facie case rather than the plaintiff's attempt to rebut the employer's legitimate reason for its action. *See Woodruff*, 482 F.3d at 529. The difference is

critical.  Although the court held that extremely close temporal proximity can sometimes establish a prima facie case, the court went on to hold, in no uncertain terms, that the same evidence was *not* sufficient to establish pretext.  *Id.* at 530.  As the court put it:

> If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim. Assuming the intention behind the ADA's retaliation provisions was to protect the remedial scheme but not to create a permanent discipline-free zone for complainants, we conclude positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.

*Id*.  Temporal proximity therefore cannot establish pretext absent other, independent evidence.

And, even if it could, the temporal proximity here turns out to be a mirage.  Ball points to three pairs of events and corresponding responses by GW.[9]  First, he highlights that he requested intermittent leave under the FMLA and DCFMLA on July 7, 2015, and two days later Wells received Ball's GWorld card swipe records and instructed the sender to keep the records confidential while Wells "buil[t] his case."  Pl.'s Opp'n Ex. 16 at Ball_000750, Dkt. 29-18.  This timing, however, must have been a coincidence because Ball concedes that Wells "began [his] initial review of Ball's work assignment logs *after speaking with De Almeida*."  Pl.'s Response ¶ 117 (emphasis added); *see also* Wells Tr. at 61:3–64:6, Dkt. 28-20 (explaining that Wells pulled Ball's records because de Almeida raised concerns about the amount of time Ball was logging to an old preventive maintenance order).  Second, Ball points out that Owens learned that Ball was eligible for FMLA leave on August 3, 2015 and suspended Ball the next day, on August 4, 2015.  But by the time Owens learned of Ball's eligibility for leave, Ball's suspension

---

[9] Technically, all three of these events relate to Ball's eligibility or requests for FMLA or DCFMLA leave, and not the ADA or the DCHRA, but the Court considers these events in conjunction with all other potential evidence of discrimination or retaliation for simplicity and in an abundance of caution.

was already well under way. *See Carter v. Greenspan*, 304 F. Supp. 2d 13, 30 (D.D.C. 2004) ("Because [the plaintiff's] supervisors' dissatisfaction with his performance and their intentions to terminate him predated his protected activity, his retaliatory discharge claim is illogical and must be dismissed."); *Trawick v. Hantman*, 151 F. Supp. 2d 54, 63 (D.D.C. 2001) ("Because the termination process had already been initiated, following on the heels of repeated warnings and progressive disciplinary actions, no reasonable juror could conclude that the termination had been caused by the [protected] activity"), *aff'd*, No. 01-5309, 2002 WL 449777, at *61 (D.C. Cir. Feb. 21, 2002). By that point, Wells had already completed his initial investigation and sent his conclusions to Owens on July 27, 2015. And the record reflects that Owens suspended Ball on August 4—and not earlier, before Owens even learned of his leave eligibility—for the simple reason that Ball had called in sick, and Owens wanted to speak with him in person before suspending him in a letter or over the phone. *See* GW Tr. Ex. 18 at Ball_000349–50, Dkt. 30-3. Ball offers no evidence other than speculation to the contrary. Third, Ball notes that Owens learned about Ball's request for continuous leave on August 11, 2015, and GW terminated Ball two days later on August 13, 2015. But, again, by that point Ball's termination was well under way. Indeed, Wells's email correspondence, on which Ball relies, demonstrates that he viewed Ball's August 11 request for leave as a last-minute effort to shield himself from what was already coming. *See* Pl.'s Opp'n Ex. 12, Dkt. 29-14 (stating that Ball's request for leave was an attempt "to protect himself from any further action" but that it was "to[o] late for that"). In short, the purported temporal proximity on which Ball relies is either illogical or contradicted by the record and, in any event, cannot establish pretext absent other, independent evidence.

*Third*, Ball argues that the fact he was not issued an iPod upon his return shows that GW was trying to sabotage him by forcing him to enter his time manually and make a mistake. But

there is no evidence in the record to support that theory. The exact reason why Ball never received an iPod remains in dispute. But even taking Ball's account—that he was told he would receive an iPod after the employee in charge of setting up iPods returned from vacation[10]—as a given, Ball has not produced any evidence showing whether the employee was in fact on vacation and, if so, when the employee returned. And, of course, GW's explanation—that it was Ball's responsibility to get his email password reset before he could receive an iPod—if true would be even more innocuous. Either way, nothing in the record suggests that GW's failure to issue Ball an iPod was itself a discriminatory or retaliatory action. And Ball's mere speculation that his lack of an iPod was part of a grand scheme to lure him into committing a terminable offense is not a sufficient basis for sending his claim to a jury.

*Fourth*, Ball argues that he was not given an adequate opportunity to respond to the accusations against him. To be sure, shortcomings in an employer's investigation can trigger an inference of pretext if the investigation "lacks the careful, systematic assessments of credibility of the witnesses and evidence one would expect in an inquiry on which an employee's reputation and livelihood depended." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 299 (D.C. Cir. 2015) (alteration adopted and internal quotation marks omitted). But the employee must show that the employer's investigation "was not just flawed but inexplicably unfair." *Id.* (internal quotation marks omitted). Ball has not met that threshold.

Ball claims he was not given an opportunity to review the surveillance footage that Wells and Owens had reviewed or to respond to all of the allegations GW now raises. *See* Pl.'s Opp'n at 14, 16–17. But no reasonable juror would conclude that declining to allow an employee to

---

[10] *See* Ball Tr. at 16:3–7, Dkt. 29-6 ("The gentleman, the programmer, said he's on vacation. So . . . until he came back, they told me to write everything down manually and then give it to [de Almeida] and then she would put everything in the system."); *see also id.* at 69:14–71:11.

review security tapes held by the employer made the investigation process "inexplicably unfair." *Burley*, 801 F.3d at 299 (internal quotation marks omitted); *cf. Brady*, 520 F.3d at 496 (emphasizing that courts lack the competence to micro-manage an employer's misconduct policies and business practices). And although Ball may not have been confronted with each and every allegation against him, Wells carefully documented his conclusions and the objective evidence—including card swipe records and video surveillance footage—on which he relied in his July 27 letter. And Wells and Owens did confront Ball with the most serious accusations against him—those concerning his July 13 and 14 logs—and followed up on the explanations he provided.

In response to the July 14 discrepancies, Ball doubled down on his paper records, giving Wells and Owens little to go on beyond the card swipe records and surveillance footage they had already reviewed.[11] Ball has now offered, in litigation, a convoluted explanation for how his swipe activity elsewhere on campus on July 14 can be reconciled with eight hours of maintenance work in Lafayette Hall. But even this recent account consists largely of speculation about what Ball *might* have been doing, including several explanations in the alternative. Ball Decl. ¶¶ 29–30. More importantly, there is no evidence that Ball offered this explanation to Wells, Owens, or anyone else at GW before his termination.

In response to the July 13 discrepancies, Ball claimed that the report that he fixed a garbage disposal in Room 608 of Lafayette Hall (which does not exist) had been a mistake, and

---

[11] Owens Tr. at 58:22–59:5, Dkt. 28-14 ("[H]is interview was very short, because all he said was, he's going to stick to what he put on paper. That's it."); Wells Tr. at 159:11–13, Dkt. 28-20 ("We showed him the stuff that he wrote down. He just said if I wrote it down, I did it."); Ball Tr. 162:3–164:15, Dkt. 29-6 ("Q: Is it true that when you met with Mr. Owens and Mr. Wells, they told you that they reviewed video footage showing that you did not go into each of these rooms on the 6th floor of Lafayette hall? A: Yes. Q: Okay. How did you respond when they told you that? A: . . . I told them that . . . the work that I said I completed, I completed.").

he had in fact replaced a garbage disposal in Room 608 of South Hall and another in the basement of Lafayette Hall. Pl.'s Response ¶ 168. Wells followed up on that explanation by checking to see if Ball had swiped into or checked out a key for South Hall or had ordered any materials for a repair in Lafayette Hall. *Id.* ¶¶ 169–70; 175. He had not. *Id.*

Put simply, Wells and Owens "took a number of steps one would expect of an investigator who sincerely sought to determine what actually happened," and GW's investigation into Ball's conduct was not so perfunctory or unfair as to justify an inference of pretext. *Burley*, 801 F.3d at 299.

*Sixth*, Ball claims that the involvement of an employee named "Cricket" in Wells's investigation was abnormal and violated GW's rules, casting doubt on the investigation's legitimacy. *See* Pl.'s Opp'n at 17. The Court is not persuaded. The fact an employer has "departed from previous practice in regard to [the employee's] termination[] . . . may still not be enough to show pretext." *Williams v. Verizon Washington, D.C. Inc.*, 304 F. Supp. 3d 183, 200 (D.D.C. 2018); *see also Johnson v. Lehman,* 679 F.2d 918, 922 (D.C. Cir. 1982) (violation of an employer's own regulations and procedures may not be enough to show pretext). And, here, Cricket's role was relatively minor. She assisted Wells in obtaining swipe records and translating his handwritten notes into a professional, type-written document. *See* Wells Tr. at 91:5–10, Dkt. 30-2; Pl.'s Opp'n Ex. 16 at Ball_000750–51. And Wells specifically instructed her to keep Ball's potential misconduct confidential while Wells completed his investigation. *See* Pl.'s Opp'n Ex. 16 at Ball_000750. No reasonable juror could find that Wells's decision to receive assistance in gathering evidence and documenting the results of his investigation established pretext, even assuming that doing so violated a GW policy.

Finally, Ball notes in passing that he had never been disciplined before returning to work on June 23, 2015. But an employer need not apply a "progressive discipline policy" to avoid an inference of pretext, especially where, as here, an employer's written policies expressly permit it to terminate the employee automatically for the misconduct at issue. *Long v. Endocrine Soc'y*, 263 F. Supp. 3d 275, 286 (D.D.C. 2017). That Ball had never been disciplined for conduct before June 23, 2015 does not make GW's conclusions about his conduct after June 23, 2015 pretextual.

To be clear, the question is not whether Ball in fact committed the conduct he was purportedly terminated for. The only question is whether GW "honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183 (internal quotation marks omitted). None of Ball's evidence—even when considered cumulatively—provides a sufficient basis for a jury to conclude that GW did not honestly and reasonably believe that Ball squandered work hours and submitted falsified work reports. There is no dispute that Ball was the subject of not one, but two, investigations that focused almost entirely on objective evidence, such as Ball's written work logs, GWorld card records, and CCTV footage. The GWorld card records alone—which Ball concedes were accurate and reviewed by both Wells and Owens in the course of their investigations—reveal a pattern that would have been difficult for any employer to ignore. Ball attempts to explain away the litany of irregularities in his card swipe records—including the eight days on which the only building he entered was Guthridge Hall and the particularly problematic examples of July 2, 6, 7, 13, 14, and 15—by stating that he may have checked out a master key or followed others into buildings without swiping his card. *See, e.g.*, Pl.'s Response ¶¶ 131–32, 196; Ball Decl. ¶ 20; Pl.'s Opp'n at 16. But these possibilities did not prevent GW from relying on the objective card swipe records available to it at the time. Even now, Ball will

not actually say whether he used a master key or "piggybacked" on any of the particular occasions at issue. He merely speculates that he "may" have done so and that, while he cannot specifically recall piggybacking, doing so was a common practice. *See, e.g.*, Ball Decl. ¶ 20. Moreover, there is no evidence that Ball provided this explanation to Wells, Owens, or anyone else at GW at the time of his termination or at any point prior to bringing this suit. Further, Wells and Owens did not rely solely on card swipes but also reviewed GW's CCTV footage for confirmation. *See* Pl.'s Response ¶¶ 126, 171, 195. For example, footage they reviewed for July 14, 2015 confirmed that Ball entered the sixth floor of Lafayette Hall only once, at 11:23 A.M., and left less than two hours later, at 1:08 P.M. *Id.* ¶ 176.

An employer need not be certain of wrongdoing before making a decision based on the best available evidence at the time. "Employers obviously have to resolve factual disagreements all the time in order to make employment decisions regarding . . . firing, and the like." *Brady*, 520 F.3d at 496. And "[i]n many situations, employers must decide disputes based on credibility assessments, circumstantial evidence, and incomplete information." *Id.* In this case, it was reasonable for GW to rely on objective card-swipe data and surveillance footage, even if that evidence could not rule out every possible explanation for what appeared to be an extensive and alarming pattern of loafing and inconsistencies. Even assuming that it was common practice for employees to "piggyback" off others' swipes, as Ball maintains, GW was not required to assume that every one of the many irregularities in Ball's swipe records over a series of days could be explained by the possibility of piggybacking. And even if GW's conclusions about Ball were mistaken, they do not show "an error too obvious to be unintentional." *Fischbach*, 86 F.3d at 1183. The record is clear that GW terminated Ball because it honestly believed, after two

investigations, that Ball falsified work logs and violated work rules.[12]  No reasonable jury could conclude otherwise.

One additional wrinkle remains.  In Ball's opposition, he advances a "mixed motive" theory for the first time, arguing that even if GW reasonably believed he was guilty of committing a terminable offense, discrimination or retaliation remained an additional motivating factor that existed alongside GW's legitimate reasons for terminating him.  *See* Pl.'s Opp'n at 17–18.  The Court rejects this theory for two independent reasons.

*First*, Ball did not advance a mixed-motive theory in his complaint, *see* Compl. ¶¶ 148– 150, 173–75, 194, 199, 203, Dkt. 1, and asserts it for the first time in response to GW's motion for summary judgment, *see* Pl.'s Opp'n at 17–18.  Courts have repeatedly rejected similar last-ditch efforts by plaintiffs.  *See, e.g.*, *Williams v. Dodaro*, 806 F. Supp. 2d 246, 262 (D.D.C. 2011) (declining to apply mixed-motive analysis on summary judgment where the plaintiff's "amended complaint and previous pleadings . . . ma[de] clear that she ha[d] been proceeding throughout th[e] litigation on a single motive theory"); *Perry v. Shinseki*, 783 F. Supp. 2d 125, 134 (D.D.C. 2011) (declining to apply mixed-motive analysis on summary judgment in part because the allegations in the complaint focused only on but-for causation), *aff'd*, 466 F. App'x 11 (D.C. Cir. 2012); *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 145 (D.D.C. 2010) (same).  And for good reason: allowing an employee to shift theories of liability in

---

[12] The Court need not consider all of the legitimate reasons GW has proffered for terminating Ball.  The Court therefore does not resolve whether GW reasonably concluded that Ball lied to Wells about visiting the library or that he violated the facilities department's work rules by clocking in from a cell phone instead of a landline.  The Court assumes, without deciding, that Ball has raised a genuine issue of fact with respect to these reasons, but concludes that GW's remaining reasons were sufficient to justify Ball's termination.  *See Davis*, 26 F. Supp. 3d at 119 (collecting cases holding that "when an employer offers multiple independent reasons for the termination, each of which may stand alone as non-discriminatory justifications, [the] Plaintiff must raise an inference of pretext as to each proffered justification" (emphases omitted)).

response to a dispositive motion forces the employer to respond to a moving target, devoting

significant resources to discovery and briefing only to have the issues shift at the last second.

*Second*, even if the Court were to consider Ball's mixed-motive theory, that theory is not

supported by the record.  Indeed, it is logically inconsistent with the arguments Ball raises in

support of his single-motive theory.  Ball's position—beginning with his complaint and

continuing through his testimony and opposition brief—has consistently been that GW's reasons

for terminating him were *false* and that GW plotted to terminate him as early as February 2015

when he requested leave as an ADA or DCHRA accommodation.  Under Ball's theory, GW's

failure to issue him an iPod, Wells's and Owens's investigations, Cricket's involvement, and

GW's ultimate "conclusions" were all part of an overarching conspiracy to get rid of Ball, either

as punishment for taking leave in the past or to avoid granting him leave in the future.  That

theory and the facts Ball relies on to support it are at odds with the idea that GW *genuinely*

terminated Ball for misconduct but nonetheless harbored an additional discriminatory or

retaliatory motive at the same time.  *See Perry*, 783 F. Supp. 2d at 134 (rejecting mixed-motive

theory where the plaintiff's "opposition brief focuse[d] solely on [rebutting] the [employer's]

justifications and d[id] not present evidence suggesting that race, gender, or age were factors in

the adverse action").  Because "a jury, looking at the record evidence and drawing all inferences

in [Ball's] favor," could not "conclude that [Ball's disability or protected conduct] was a

motivating factor for the discharge," *Johnson*, 823 F.3d at 706 (internal quotation marks

omitted), the Court would reject Ball's mixed-motive claim even if it had been properly alleged

in his complaint.

Accordingly, the Court will grant summary judgment for GW on counts 1 and 2.

### B.     Ball's FMLA Claims

"The FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he was engaged in activity protected by the Act." *Hopkins v. Grant Thornton Int'l*, 851 F. Supp. 2d 146, 152 (D.D.C. 2012) (citations and internal quotation marks omitted).  Ball advances both claims, but neither is meritorious.

"In analyzing FMLA retaliation claims, courts apply the burden-shifting framework adopted in *McDonnell Douglas*." *Thomas*, 227 F. Supp. 3d at 99.  Ball's FMLA retaliation claim therefore fails for the same reason as his ADA and DCHRA claims: he has not provided sufficient evidence from which a jury could conclude that GW's proffered reasons for terminating him were not its actual reasons.

"To state an FMLA interference claim, a plaintiff must allege facts sufficient to show, among other things, that (1) he was entitled to take leave because he had a 'serious health condition,' (2) he gave his employer adequate notice of his intention to take leave, and (3) his employer denied or otherwise interfered with his right to take leave." *Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 155 (D.D.C. 2013).  Like the ADA and DCHRA, "the FMLA does not protect an employee's job against a legitimate, unrelated, reason for separation." *Thomas*, 227 F. Supp. 3d at 110 (internal quotation marks omitted).  But the D.C. Circuit has not yet decided whether the *McDonnell Douglas* framework applies to interference claims brought under the FMLA or if the employer bears "the burden of proving that the employee dismissed during FMLA leave would have been dismissed regardless of the employee's request for leave." *Id.* at 110–11 (alteration adopted and internal quotation marks omitted).  This Court need not decide that question either because, in this case, the difference is immaterial.  If GW has the

burden of proving that it would have terminated Ball irrespective of his entitlement to leave under the FMLA, it has carried its burden based on the undisputed facts underlying Wells's and Owens's investigation, including Ball's GWorld swipe records.

In addition, Ball has not met the basic elements of an interference claim. He was not "entitled to take leave," *Hodges*, 959 F. Supp. 2d at 155, at the time he was terminated because his FMLA leave had already been exhausted. Nor had he given GW "adequate notice of his intention to take leave" at some point in the future, once he regained eligibility. *Id.* It is undisputed that Ball was granted FMLA leave upon request whenever it was available. And when it was exhausted, GW nearly always granted the leave he requested under the DCFMLA or as an ADA or DCHRA accommodation. His FMLA interference claim therefore rests solely on the possibility that his termination was an attempt to interfere preemptively with his *future* entitlement to FMLA leave, once it accrued. The FMLA does not contemplate such a claim, and even if it did, there is insufficient evidence in the record to support it.

Accordingly, the Court will grant summary judgment for GW on count 3.

## C.    Remaining Claims

Ball initially brought two more claims for wrongful termination and negligence against GW based on GW's alleged violations of the ADA, DCHRA, and FMLA. *See* Compl. at 22–23. He now concedes, however, that those claims are barred by law and that GW is entitled to summary judgment on them. Pl.'s Opp'n at 4. The Court recognizes that, "[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition." *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016). But where, as here, the plaintiff has "filed a timely opposition to the [defendant's] motion for summary judgment," made an effort to "present[] genuine disputes of material fact that would bar entry of judgment" on certain counts but not others, and has "specifically informed the Court

that [he] d[oes] not oppose the entry of judgment against [him] on" certain counts, "there is no dispute for the Court to adjudicate" with respect to those counts, "and the requirements of Rule 56 have been satisfied." *Barot v. Embassy of Republic of Zambia*, 299 F. Supp. 3d 160, 165–66 n.1 (D.D.C. 2018), *appeal filed*, No. 18-7045 (D.C. Cir. Apr. 6, 2018). In addition, and in the alternative, the Court agrees with the parties that Ball's wrongful termination and negligence claims are barred as a matter of law because the ADA, DCHRA, and FMLA provide the exclusive remedy for violations of those statutes. Accordingly, the Court will grant summary judgment for GW on counts 4 and 5.[13]

## CONCLUSION

For the foregoing reasons, the Court grants GW's motion for summary judgment. A separate order accompanies this memorandum opinion.

DABNEY L. FRIEDRICH
United States District Judge

March 31, 2019

---

[13] To the extent Ball ever intended to bring ADA or DCHRA claims for failure to accommodate, he has clearly abandoned those claims and made no effort to support them with evidence in the record. *See generally* Pl.'s Opp'n.